**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

CITADEL WELLWOOD URBAN RENEWAL,
LLC,                                    Civ. No. 1:21-cv-16700-NLH-EAP

            Plaintiff,           **OPINION**

    v.

BOROUGH OF MERCHANTVILLE;
EDWARD F. BRENNAN; ANTHONY J.
PERNO, III; DANIEL J.
SPERRAZZA; ANDREW O. MCCLOONE;
AND DENISE BROUSE

            Defendant.

**APPEARANCES**:

ROBIN RABINOWITZ
ROBERT W. MAURIELLO
GIMIGLIANO MAURIELLO & MALONEY, P.A.
163 MADISON AVENUE
PO BOX 1449
MORRISTOWN, NJ 07960-1449

*Attorneys for Plaintiff*

MATTHEW PAUL MADDEN
MADDEN & MADDEN
108 KINGS HIGHWAY EAST, SUITE 200
P.O. BOX 210
HADDONFIELD, NJ 08033-0389

*Attorney for Defendants*

**HILLMAN**, District Judge

    Before the Court is Defendant's Motion for Summary Judgment

(ECF 34).  For the reasons expressed below, the Motion for

Summary Judgment will be granted.

I.    **BACKGROUND**

   a. **Redevelopment Plan and Financial Agreement**

   Plaintiff, Citadel Wellwood Urban Renewal, LLC ("Citadel"
or "Plaintiff"), is a redevelopment company in New Jersey.
(Statement of Material Facts, ECF 34-2 [hereinafter "SOMF"] at ¶
1).  Richard DePetro is the managing member of Citadel.  (Id. at
¶ 2).  In June 2011, the Borough of Merchantville ("the
Borough") adopted a redevelopment plan intended to restore and
redevelop a property called Wellwood Manor, located at 606 West
Maple Avenue ("the Property").  (Id. at ¶ 9).  On September 26,
2011, the Borough entered into a Redevelopment Agreement with
Citadel to redevelop the Property.  (Id. at ¶ 10).

   On December 12, 2011, Citadel acquired the Property.  (Id.
at ¶ 11).  Plaintiff applied for a Long-Term Tax Exemption
("LTTE") pursuant to N.J.S.A. 40A:20-8, et seq. and payment in
lieu of tax ("PILOT") program".  (Id. at ¶ 12; ECF 34-6 at 97,
104).  The Borough issued Resolution R12-138 on November 19,
2012 approving the LTTE, and on February 11, 2013 the Borough
enacted Ordinance 13-01, approving a Financial Agreement
authorizing the LTTE.  (ECF 34-6 at 97, 104).  On February 12,
2013, Citadel and the Borough entered into the Financial
Agreement.  (SOMF at ¶ 13).

   Pursuant to the Financial Agreement, Citadel received a tax
abatement for up to 30 years in exchange for its redevelopment

of the Property.  (Id. at ¶¶ 14-15; ECF 34-6 at 108-24).  Under
the Financial Agreement, Citadel paid funds under the PILOT
program in lieu of taxes.  (ECF 34-6 at 110-13).  During the
first five years of the agreement, 63% of the funds went to the
Merchantville Board of Education, 5% went to the County, and 32%
went to the Borough.  (SOMF at ¶ 20; ECF 34-6 at 193-94).  The
first payment became due in August 2013.  (ECF 35-12 at 2).

Paragraph 19 of the Financial Agreement provides that

> The sale of the Project by the Entity, or
> the sale of the interests of the managing
> member of the Entity, the sale of the
> Entity, or the sale of the majority interest
> in the Entity, shall render this Agreement
> null and void, unless the assumption of the
> terms, conditions and obligations of this
> Agreement by the transferee urban renewal
> entity person, partnership and/or
> corporation, is approved by Resolution of
> the Borough Council of the Borough of
> Merchantville, upon whose approval this
> Agreement and its then remaining obligations
> and the tax exemption of the improvements
> shall continue, and inure to the benefit of
> the transferee urban renewal entity.

(ECF 34-6 at 117-18).

In February 2020, Citadel entered a contract to sell the
Property to Maple Gardens Urban Renewal Entity, LLC ("Maple
Gardens" or the "Purchaser").  (SOMF at ¶ 26; ECF 35-13 at 8).
Citadel advised the Borough of its intention to sell the
Property in March 2020.  (SOMF at ¶ 27).  In May 2020, the
Purchaser submitted information to the Borough in support of its

request to continue the PILOT program following its purchase of the Property.  (Id. at ¶ 28).  On June 29, 2020, counsel for the Borough advised counsel for Citadel that the Borough would not transfer the Financial Agreement, but instead would consider it null and void upon the sale.  (Id. at ¶ 29).

### b. State Court Proceedings

On August 12, 2020, Plaintiff filed a complaint in New Jersey Superior Court, Camden County, Law Division.  (Id. at ¶ 30).  In the complaint, Plaintiff alleged that the Borough's "denial of plaintiff's courtesy request to sell the Property was arbitrary, capricious, unreasonable and unlawful."  (ECF 34-6 at 235).  Plaintiff alleged that Paragraph 19 of the Financial Agreement no longer had any effect and in the alternative that it was void and unenforceable.  (ECF 34-6 at 236).  Plaintiff also alleged that the Borough denied the request to sell the Property in violation of its substantive and procedural due process rights.  (SOMF at ¶ 31; ECF 34-6 at 236).

On April 22, 2021, the Honorable Deborah Silverman Katz of the Superior Court issued an Order and Memorandum of Decision on summary judgment.  (SOMF at ¶ 32).  Judge Silverman Katz ordered the Borough to make an official decision on Plaintiff's request to sell the Property with the tax benefits of the Financial Agreement.  (Id.; ECF 34-6 at 240).  In the Memorandum of Decision, Judge Silverman Katz explained that the Borough had a

duty of good faith under the Financial Agreement, pursuant to which "plaintiff had a justifiable expectation that the Borough would act on the request to assign the rights and obligations of the Financial Agreement."  (ECF 34-6 at 267).  Judge Silverman Katz determined that Paragraph 19 of the Financial Agreement was valid and required the Borough's consent to transfer the tax benefits to any purchaser of the Property, although Plaintiff "is free to sell the property both under the Redevelopment and Financial Agreements."  (SOMF at ¶ 33; ECF 34-6 at 264).

In addition, in discussing Plaintiff's procedural due process claim, Judge Silverman Katz held that Plaintiff did "not possess an unequivocal right to transfer the LTTE in the Financial Agreement, but merely had an abstract expectation in selling the property with the Financial Agreement attached upon the Borough's consent."  (SOMF at ¶ 34; ECF 34-6 at 275).  Accordingly, the Court held that "plaintiff does not have a protected property interest that warrants the protection of Due Process under the New Jersey and federal constitutions."  (Id.).

On June 1, 2021, Plaintiff filed a notice of appeal of Judge Silverman Katz's decision, and on May 25, 2022, the New Jersey Appellate Division affirmed.  (SOMF at ¶¶ 38-39).

c. **Resolution Denying Transfer of Financial Agreement**

Following Judge Silverman Katz's Order, the Borough convened an Ad Hoc Committee of Councilmembers to review

5

Plaintiff's transfer request, including Defendants Daniel
Sperrazza, Anthony Perno, and Andrew McCloone.  (Id. at ¶ 35;
ECF 34-6 at 281).  On August 9, 2021, in a Council meeting, the
Committee recommended against transfer of the Financial
Agreement.  (SOMF at ¶ 41).  Council and Committee member
Anthony Perno spoke and stated that unlike other PILOT program
agreements, in this Agreement the Borough shared the payments
with the Board of Education.  (Id. at ¶ 42).  In addition, he
stated that the Purchaser had not presented argument for why the
PILOT should be extended.  (Id. at ¶ 43).  The Council followed
this recommendation and adopted Resolution 21-90, which stated
that transferring the PILOT program "would not be in the best
interest of the citizens of the Borough of Merchantville."  (Id.
at ¶ 44; ECF 34-6 at 326-29).

   d. **Federal Court Proceedings**

   After the Council passed the resolution denying transfer of
the Financial Agreement, Plaintiff filed the instant Complaint
against five defendants: The Borough of Merchantville, Edward F.
Brennan, Anthony J. Perno, III, Daniel J. Sperrazza, Andrew O.
McCloone, and Denise Brouse.  Defendant Perno is President of
the Merchantville Borough Council, and Defendants Perno,
Sperrazza, and McCloone are all members of the Borough Council
and, as noted above, made up an Ad Hoc Committee formed in
response to Judge Silverman Katz's decision regarding procedural

due process.  (SOMF at ¶ 35).  As also explained above, Perno,
Sperrazza, and McCloone recommended against permitting the
transfer and the Council adopted a Resolution denying the
transfer.  (Id. at ¶¶ 41, 44).  Defendant Edward F. Brennan is
the Mayor of the Borough of Merchantville.  (Id. at ¶ 4).  Mayor
Brennan was involved in communicating with Plaintiff about the
transfer of the Financial Agreement.  (Id. at ¶ 56).  He also
appointed the selected Councilmembers to the Ad Hoc Committee.
(ECF 34-6 at 281).  Defendant Denise Brouse is Merchantville's
Borough Clerk.  (Id. at ¶ 8).  Clerk Brouse was involved in the
Committee insofar as she set up Zoom meetings between the
Committee and Purchaser.  (Id. at ¶ 66).  She did not attend the
meetings.  (Id.).

The Complaint alleges: (1) Violation of Procedural Due
Process Rights pursuant to § 1983 and the Fourteenth Amendment
to the United States Constitution against all Defendants; (2)
Violation of Substantive Due Process Rights pursuant to § 1983
and the Fourteenth Amendment to the United States Constitution
against all Defendants; (3) Violation of Equal Protection Rights
pursuant to § 1983 and the Fourteenth Amendment against all
Defendants; (4) Violation of Substantive Due Process Rights
pursuant to N.J.S.A. 10:6-2(c), the New Jersey Constitution, and
the Fourteenth Amendment to the United States Constitution
against all Defendants; (5) Violation of Equal Protection Rights

pursuant to N.J.S.A. 10:6-2(c), the New Jersey Constitution, and the Fourteenth Amendment to the United States Constitution against all Defendants; (6) Breach of Doctrine of Fundamental Fairness against all Defendants;[1] (7) Breach of Contract against the Borough; (8) Breach of Implied Duty of Good Faith and Fair Dealing against the Borough; and (9) Violation of New Jersey Law against all Defendants. (ECF 1).

On November 3, 2021, Defendants filed their Answer. (ECF 6). On May 26, 2023, Defendants filed a Motion for Summary Judgment. (ECF 34). Plaintiff filed its response on June 23, 2023. (ECF 35). On June 30, 2023, Defendants filed their reply. (ECF 36).

### e. Anti-Semitism Allegations

In support of its claims, Plaintiff sets forth allegations of anti-Semitism against Defendants. First, Plaintiff alleges that before the Borough entered into its Redevelopment Agreement related to the Property with Citadel, in 2009, another company NJ Norse Holdings, Inc. ("Norse") had corresponded with the Borough about redeveloping the Property. (Counterstatement of

---

[1] It is not entirely clear from the Complaint whether this Count, Count Six for the Breach of the Doctrine of Fundamental Fairness, is raised against all or some Defendants, as it merely makes allegations about "Defendants." The Court will interpret this as a claim against all Defendants due to the lack of clarity. The same is true for Count Nine for "Violation of New Jersey Law."

Material Facts,[2] ECF 35-1 at 31 [hereinafter "COMF"] at ¶ 12; ECF 35-16; ECF 35-17; ECF 35-18; ECF 35-19; ECF 35-20; ECF 35-21; ECF 35-22).  Norse had an Orthodox Jewish principal.  (ECF 34-6 at 33-34).  Plaintiff alleges that the Borough approached Norse with skepticism, requiring assurances and guarantees that complaints made by tenants in another property operated by Norse would not be ignored.  (COMF at ¶¶ 13-14).  Plaintiff alleges that Borough employees referred to Norse as "slumlords."  (Id. at ¶ 17).  The agreement fell through due to Norse's inability to obtain a performance bond, which Plaintiff alleges the Borough used as a pretense to avoid the agreement.  (Id. at ¶ 16).  Plaintiff alleges that when it acquired the Property in 2011 it was not subject to any of these same requirements.  (Id. at ¶ 18).  Plaintiff's contention in this regard, ironically,

---

[2] Pursuant to Local Rule 56.1 "the opponent [of a Motion for Summary Judgment] may also furnish a supplemental statement of disputed material facts, in separately numbered paragraphs citing to the affidavits and other documents submitted in connection with the motion, if necessary to substantiate the factual basis for opposition."  Here, Plaintiff set out a Counterstatement of Material Facts immediately following and in the same document as its Response to Defendants' Statement of Material Facts.  Defendants did not file a response to the Counterstatement of Material Facts.  Thus, for purposes of this Motion, this Court will deem true the facts alleged in the Counterstatement, see V.C. by Costello v. Target Corp., 454 F. Supp. 3d 415, 419 (D.N.J. 2020) ("Local Civil Rule 56.1(a) deems a movant's statement of material facts undisputed where a party does not respond or file a counterstatement."), and where relevant have considered these admitted facts for purposes of deciding the pending motion.

amounts to an admission that it benefited (apparently without protest) from the Borough's alleged anti-Semitism some twelve years ago.

Plaintiff alleges that in 2018 the Borough was again "upset" by a prospective sale of the Property from Citadel to MA Acquisitions, LLC, a company with an Orthodox Jewish principal. (Id. at ¶¶ 19-21). Next, Plaintiff alleges that the Borough refused to consider Citadel's request to sell the Property with the Financial Agreement to Maple Gardens, which has an Orthodox Jewish principal, Sam Haikins. (Id. at ¶¶ 22-23). This prospective sale and transfer precipitated the state court litigation and subsequently this litigation.

## II.  <u>LEGAL STANDARD</u>

Summary judgment is appropriate where the Court is satisfied that the materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, or interrogatory answers, demonstrate that there is no genuine issue as to any material fact and that given the undisputed facts the moving party is entitled to a judgment as a matter of law. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); Fed. R. Civ. P. 56(a).

A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a disputed fact may affect the outcome of the suit.  Id.  In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence.  Id. at 255.  Instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor."  Id.

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  Once the moving party has met this burden, the burden shifts and the nonmoving party must identify specific facts showing that there is a genuine issue for trial.  Id.  To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Anderson, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

First, the Court will discuss whether any immunity doctrines shield defendants from liability, specifically addressing legislative immunity and qualified immunity.  Then,

the Court will address the substance of Plaintiff's civil rights claims.  Lastly, the Court will address Plaintiff's assertions of municipal liability under Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978).

### III. DISCUSSION

#### a. Subject Matter Jurisdiction

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and § 1367.

#### b. Civil Rights Claims (against all Defendants)

Plaintiff raises both substantive and procedural due process claims under federal law pursuant to 42 U.S.C. § 1983 (Counts One and Two) and a substantive due process claim under state law pursuant to the New Jersey Civil Rights Act (Count Four) as well as an equal protection claims under both federal and state law (Counts Three and Five).  All of these claims are raised against all Defendants.

##### i. Absolute Legislative Immunity

Councilmembers Perno, Sperrazza, and McCloone are implicated in Counts One through Five, raised against all Defendants.  Defendants Perno, Sperrazza, and McCloone contend that they are entitled to absolute immunity because the alleged conduct is part of their legislative function.  Specifically, they argue that "the Councilmembers are entitled to absolute legislative immunity since Plaintiff's claims arise out of the

12

Council's adoption of Resolution 21-90 which denied the Purchaser's request to assume the terms and conditions of the Financial Agreement."  (ECF 34-1 at 33).

Plaintiff argues that Defendants' actions here are not part of their legislative function, but rather are part of their administrative duties.  They argue that a decision that "affects a small number or a single individual" is administrative, as are "ordinances or resolutions passed in an effort to facilitate enforcement of existing land use laws, rather than enact new laws involving 'broad-based policy.'"  (ECF 35 at 27 (citations omitted)).  Plaintiff advises that the fact that the Borough's decision was "memorialized and enforced by means of a resolution" does not render it legislative.  (Id.).

In Bogan v. Scott-Harris, 523 U.S. 44, 48-49, 54 (1998), the Supreme Court recognized the long-standing principle that legislatures are entitled to absolute immunity from liability for their legislative activities and held that "local legislators are likewise absolutely immune from suit under § 1983 for their legislative activities."

In Bogan, after preparing his budget, the mayor introduced an ordinance eliminating 135 city positions, including the plaintiff's.  Id. at 47.  The plaintiff filed a § 1983 action against the city, the mayor and other city officials.  Id.  She alleged that the elimination of her position was racially

13

motivated and in retaliation against her for exercising her first amendment rights regarding another employee who was politically connected with city officials.   Id.

The Supreme Court found that the act of voting on an ordinance was "in form, quintessentially legislative."   Id. at 55.   In addition, the Court held that the mayor introducing the budget and signing an ordinance into law were legislative acts because such actions were "integral steps in the legislative process."   Id.   The Court determined that the ordinance was legislative in substance because it "reflected a discretionary, policymaking decision implicating the budgetary priorities of the city and the services the city provides to its constituents."   Id. at 55-56.

The Supreme Court in Bogan made an important distinction between legislation that terminates a particular employee, and legislation that abolishes a certain position.   Id. at 56.   The Supreme Court found that the ordinance that abolished plaintiff's position was a legislative act because it had possible implications beyond the current holder of the position. Id.   Conversely, an ordinance that serves only to terminate an employee is not a legislative act.   See In re Montgomery County, 215 F.3d 367, 376 (3d Cir. 2000) (finding act of firing employee was not a substantive legislative act entitled to absolute immunity).

The Third Circuit has explained that "[i]n determining whether legislative immunity attaches to municipal actors engaging in arguably administrative activities, we ask whether the activities are 'both substantively and procedurally legislative in nature.'"  Baraka v. McGreevey, 481 F.3d 187, 198 (3d Cir. 2007) (quoting In re Montgomery County, 215 F.3d at 376).

This Court first addresses whether the resolution is substantively legislative.  An act is substantively legislative if it involved "policy-making of a general scope" or line-drawing even where the action may have an adverse impact on one individual or entity.  See, e.g., Schlegel v. Koteski, 307 F. App'x 657, 660 (3d Cir. 2009) ("While the actions may have had an adverse impact on Schlegel as the individual who eventually was elected to the position of Real Estate Tax Collector, the decisions concerned the scope of the office and expenditures of public funds on a public function for the citizens of Plum Borough.").  Whether the decision at issue affects only a single individual or small number of people is an appropriate factor weighing against a finding that the decision is substantively legislative, but it is not determinative.  Acierno v. Cloutier, 40 F.3d 597, 610 (3d Cir. 1994).

For example, in Acierno the Third Circuit found that a zoning ordinance directed at a single property was substantively

legislative where "the subject property consisted of thirty-eight acres of unimproved land with an approved development plan calling for 322 apartment units and some commercial use" and where "specific concerns arose such as whether the development plan complied with wetlands regulations, the fire prevention code, and public works regulations, and that the project as planned may pose serious traffic and road access problems." Id. at 613.  Another factor is whether the decision involved the enactment or amendment of legislation or merely enforcement of already existing law. Id. at 611 (quoting Jodeco, Inc. v. Hann, 674 F. Supp. 488, 494-95 (D.N.J. 1987)).

The resolution here involved the application of an already existing law, the Long-Term Tax Exemption law, N.J.S.A. 40A:20-1, et seq.  The resolution declined to "transfer the terms and conditions of the Financial Agreement pursuant to the Long-Term Tax Exemption Law, N.J.S.A. 40A:20-1, et seq., which included a Payment in Lieu of Taxes relative to the real property taxes on the Property" at issue in this case.  (ECF 34-6 at 328-29). Accordingly, it is not policy-making or line-drawing.  In addition, the resolution is specifically targeted to one property, further supporting a finding that this resolution was an administrative rather than legislative activity.  Because the resolution and decision at issue is non-legislative, absolute legislative immunity does not apply and the Court will not

dismiss Counts One through Five against Defendants Perno, Sperrazza, and McCloone on that basis.

### ii. **Qualified Immunity**

Defendants Mayor Brennan, Clerk Brouse, and Councilmembers Perno, Sperrazza, and McCloone contend that they are entitled to qualified immunity as it relates to Counts One through Five. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." Reichle v. Howards, 566 U.S. 658, 664 (2012). "When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). To overcome a defendant's qualified immunity shield, a plaintiff must plead facts showing "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." al-Kidd, 563 U.S. at 735 (citation omitted). Lower courts have "discretion to decide which of the two prongs of qualified-immunity analysis to tackle first." Id. (citing Pearson v. Callahan, 555 U.S. 223, 236 (2009)).

"The dispositive point in determining whether a right is clearly established is whether a reasonable officer in the same

situation clearly would understand that his actions were unlawful." Morillo v. Torres, 117 A.3d 1206, 1214 (N.J. 2015); Reiche, 566 U.S. at 664 (holding that a right is clearly established when the law is "sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right.") (citation omitted) (alteration in original). "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate." Id. (quoting al-Kidd, 563 U.S. 731, 741 (2011)); see also White v. Pauly, 580 U.S. 73 (2017) ("While this Court's case law do[es] not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.") (internal quotations omitted) (citation omitted).

Qualified immunity "shields an officer from suit when [he or she] makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances [he or she] confronted." Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (citing Saucier v. Katz, 533 U.S. 194, 206 (2001) (stating that qualified immunity operates "to protect officers from the sometimes 'hazy border between excessive and acceptable force'")). There is a "longstanding principle that 'clearly established law' should not be defined '"at a high level of generality."'" White, 580 U.S. at 79 (quoting al-Kidd,

563 U.S. at 742).  Rather, "the clearly established law must be 'particularized' to the facts of the case."  Id. (citing Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  "Otherwise, [p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights."  Id. (alterations in original) (citation omitted).  One final caveat regarding qualified immunity is that the defense only protects against claims against officers and other public officials in their individual capacities and not their official capacities. Kentucky v. Graham, 473 U.S. 159, 166 (1985).

Defendants argue first that Defendant Brouse is entitled to qualified immunity because her only involvement in the allegations is that she set up Zoom meetings between the Committee and Purchaser, she did not take notes or record the meetings, and did not produce certain documents during this litigation that have since been provided.  (ECF 34-1 at 35).

Next, Defendants assert that Mayor Brennan is entitled to qualified immunity because they aver that there is no evidence of "discriminatory motive," he was not aware of the Purchaser's religious affiliation, and "[a]side from two (2) statements Mayor Brennan allegedly made in 2018 which DePetro [Citadel's principal] seeks to somehow portray as anti-Semitic, there is no evidence that Mayor Brennan bore any anti-Semitic animus toward

Plaintiff's Purchaser."   (ECF 34-1 at 36).   Moreover, Defendants explain that "[n]either Mayor Brennan nor Clerk Brouse were voting members of the Council."   (ECF 34-1 at 35).

Finally, Defendants argue that "Council and Committee members Perno, Sperrazza, and McCloone are also entitled to qualified immunity since DePetro concedes he neither heard of nor witnessed them make any anti-Semitic statements and there is simply no evidence that their denial of Plaintiff's request was in any way related to Mr. Haikins' religious affiliation."   (ECF 36 at 8).

In sum, Defendants argue that the lack of evidence of anti-Semitism demonstrates that "there is no evidence to support a finding that the individual Borough Defendants 'knowingly violate[d] the law' or Plaintiff's constitutional rights," and as such they are entitled to qualified immunity.   (Id.).

Plaintiff responds that "Defendants attempt to argue that there was no 'clearly established' constitutional right at issue.   However, Defendants focus on whether their actions violated Citadel's rights, omitting a number of material facts in the process."   (ECF 35 at 27 (citation omitted)).   Pointing to the constitutional right that Plaintiff alleges Defendants have violated, Plaintiff claims that "Defendants are not permitted to deprive Citadel of its protected property rights in Wellwood Manor without providing adequate procedures and based

on bias against an ethnic group has long been established in the
Third Circuit."  (Id. at 27-28).

The Court exercises its discretion to resolve the qualified
immunity defense in Defendants' favor on the first prong of the
analysis assuming for present purposes that a municipal officer
who exercises a discretionary government function because of a
person's religious affiliation violates a clearly establish
right.  See Al Falah Ctr. v. Twp. of Bridgewater, No. 11-2397,
2013 WL 12322637, at *9 (D.N.J. Sept. 30, 2013) (denying summary
judgment on equal protection claim where there were disputed
facts demonstrating that the council had discriminatory intent
in passing an Ordinance that would prevent construction of a
Mosque).  Where Plaintiff's claims fail here is the lack of
evidence that Defendants acted in a way that violated its
statutory or constitutional rights.  With respect to Defendants
Brouse, Perno, Sperrazza, and McCloone, Plaintiff has not
pointed to any support for its argument that they engaged in
anti-Semitism.  Thus, because Plaintiff has not demonstrated
actions taking their conduct outside of the protection of
qualified immunity, Defendants Brouse, Perno, Sperrazza, and
McCloone are entitled to qualified immunity in their individual
capacities.

With respect to Mayor Brennan, Plaintiff has pointed to
allegations of anti-Semitism that it asserts informed his

conduct.  However, Plaintiff has not pointed to evidence demonstrating that Mayor Brennan acted in a manner that knowingly violated a constitutional or statutory right.  Brennan was not a voting member of the Council and Plaintiff offers no evidence that he had any role in the decision making process that resulted in the municipal resolution passed after Judge Silverman Katz's ruling.  Rather, Plaintiff complains that Mayor Brennan actively did not provide the Ad Hoc Committee with instructions or guidelines for the analysis they should engage in in assessing the transfer request.  (ECF 35 at 16–17).  Therefore, no rational juror could find that any of his actions violated Plaintiff's constitutional or statutory rights.  Accordingly, Mayor Brennan is also shieled by qualified immunity.

Therefore, Counts One through Five shall be dismissed against Mayor Brennan, Clerk Brouse, and Councilmembers Perno, Sperrazza, and McCloone in their individual capacities.

### iii. **Due Process Claims (Counts One, Two, and Four)**

Counts One, Two, and Four for violations of Due Process are raised against all Defendants; however, pursuant to the immunity discussion above only the claims against the Borough as well as Mayor Brennan, Clerk Brouse, and Councilmembers Perno, Sperrazza, and McCloone in their official capacities remain.  In determining whether Plaintiffs may have a due process claim to

survive summary judgment, the issue of whether Plaintiff has a fundamental right entitling it to due process is a threshold question that this Court must answer before considering the specifics of the federal procedural and substantive claims (Counts One and Two) and the state substantive claim (Count Four).  Defendants argue that Plaintiff has not stated a fundamental property right entitling it to due process.  (ECF 34-1 at 21, 24, 31).  Plaintiffs respond that they do have a fundamental property interest that Defendants violated.  (ECF 35 at 29).

This question was addressed in the Parties' prior litigation in New Jersey state court.[3]  Judge Silverman Katz held that "while plaintiff has a contractual right to sell the property, and thus Due Process could be implicated, plaintiff does not have a protected property interest that warrants the protection of Due Process" insofar as "Plaintiff does not possess an unequivocal right to transfer the LTTE in the Financial Agreement, but merely had an abstract expectation in selling the property with the Financial Agreement attached upon

---

[3] This Court notes that the circumstances here seem to raise an at least a colorable defense of res judicata.  However, neither party has raised this issue and as such the Court will not engage in a res judicata analysis *sua sponte*.  The Court does, however, find the state court's legal analysis on the facts before it at the time compelling and persuasive and adopts it in full here.

the Borough's consent." (ECF 34-6 at 275). Although the Court determined that the Borough had not fulfilled its contractual obligation, it concluded that "plaintiff is not being deprived of their right to sell the property, nor is that right subjected to the Borough's taking" and that "plaintiff failed to establish a legitimate claim of entitlement in transferring the benefits in the Financial Agreement." (Id.).

While we note that the claims before this Court are not identical to those before the state court in that Plaintiff alleges here that it was denied its fundamental right due to anti-Semitism, the core question of whether Plaintiff had a fundamental right or interest in the transfer of the Financial Agreement is unchanged. It is an important distinction, made by the state court and emphasized by Defendants in their briefing, that "Defendants did not refuse Plaintiff's request to sell the Property," but rather did not "approve a transfer of the Agreement and its PILOT tax benefits." (ECF 36 at 9; ECF 34-6 at 264 ("While plaintiff is free to sell the property both under the Redevelopment and Financial Agreements, the Borough's consent is required in order to transfer the tax exemption to the contract purchaser")).

This Court adopts the state Court's analysis of this issue both as a matter of comity, and as the state court set out a well-reasoned analysis of this question. As such, like the

state court, this Court grants Defendants' summary judgment on the federal and state due process claims.  As for Plaintiff's claims of a violation of substantive due process, this Court holds, as the state court held, that the tax abatement in the Financial Agreement, only transferable upon consent of the Borough, did not create a property right protected under federal or state law.  To the extent it evidenced a right to have the Borough consider, as a matter of procedural due process, any reasonable request by the Plaintiff to transfer that tax abatement to a purchaser of the Property, the Borough honored that obligation when it considered and denied that request by resolution in accordance with the state court decision.  And at no point did the Borough impede Plaintiff's right to sell the property sans tax abatement.  No procedural or substantive right Plaintiff holds under the Financial Agreement has been violated.

### iv.  **Equal Protection (Counts Three and Five)**

Counts Three and Five for violations of Equal Protection are raised against all Defendants; however, pursuant to the immunity discussion above only the claims against the Borough as well as Mayor Brennan, Clerk Brouse, and Councilmembers Perno, Sperrazza, and McCloone in their official capacities remain. The Fourteenth Amendment's Equal Protection Clause provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.

"To prevail on an equal protection claim, a plaintiff must present evidence that [it] has been treated differently from persons who are similarly situated." Renchenski v. Williams, 622 F.3d 315, 337 (3d Cir. 2010) (quoting Williams v. Morton, 343 F.3d 212, 221 (3d Cir. 2003)).  An equal protection claim can in some circumstances be sustained if the plaintiff "claims that she has been irrationally singled out as a so-called 'class of one.'" Engquist v. Or. Dep't of Agric., 553 U.S. 591, 601 (2008).  "Where a litigant asserts a so-called 'class of one' Equal Protection challenge, alleging that the litigant itself, and not a particular group, was the subject of discriminatory treatment . . . , we have required the litigant to allege 'that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" PG Publ. Co. v. Aichele, 705 F.3d 91, 114 (3d Cir. 2013) (quoting Marcavage v. Nat'l Park Serv., 666 F.3d 856, 860 (3d Cir. 2012)).  "Persons are 'similarly situated' for equal protection purposes when they are alike 'in all relevant aspects.'" Joey's Auto Repair & Body Shop v. Fayette Cty., 785 Fed. Appx. 46, 49 (3d Cir. 2019) (citations omitted).

Defendants argue that Plaintiff has not pointed to anti-Semitism and that the Borough has presented legitimate, non-discriminatory reasons for denying consent to transfer the

26

Financial Agreement.  (ECF 34-1 at 28).  Defendants argue that
Plaintiff has not pointed to evidence of discrimination, nor has
Plaintiff identified a similarly situated entity that was
treated differently.  (Id.).  Defendants argue that Plaintiff
and the Purchaser are not similarly situated because "the
Borough had completely different interests when entering into an
initial PILOT, i.e., incentivizing the redevelopment of a
property, opposed to transferring the PILOT once the property is
already rehabilitated."  (ECF 34-1 at 29).

Plaintiff responds that Defendants have a "pattern and
practice" of Anti-Semitism, and that regardless it "does not
need to show Anti-Semitism to prevail on a class-of-one equal
protection claim."  (ECF 35 at 39).  Plaintiff explains that
Citadel itself was treated differently when it initially engaged
in the Financial Agreement with the Borough and now as it seeks
to transfer the Financial Agreement to the Purchaser.  (ECF 35
at 40).  Plaintiff states that Citadel and the Purchaser are
similarly situated because the Borough maintained the same
interest in incentivizing redevelopment of the Property at the
time the Financial Agreement was entered into and at the time of
the transfer request.  (ECF 35 at 40-41).

Plaintiff has not demonstrated that it was treated
differently than another, similarly situated individual.  First,
this Court notes that Plaintiff is not claiming that Citadel was

the subject of anti-Semitism, but rather that the proposed purchaser of the property was the subject of anti-Semitism, injuring Plaintiff's ability to transfer the property along with the Financial Agreement.

Next, it is unclear whether Citadel is alleging that it is being treated differently now than it had in the past, or whether it is alleging that it was treated differently than the Purchaser is now.  If Citadel is alleging that it is being treated differently now than it was in the past, then Citadel has not pointed to a similarly situated individual as it is instead comparing its own treatment at different points in time.  If Citadel is alleging that it was treated differently than the Purchaser is now, such premise raises questions of standing, as Citadel is not the entity treated disparately, the Purchaser is.

Setting aside this issue of who is being compared, this Court is convinced that the circumstances are not sufficiently similar so as to find similarly situated entities even if Plaintiff were successful in demonstrating that there are two appropriate entities to be compared.  When the Borough entered into an agreement with Citadel the Property was in need of repair.  At the time of the proposed transfer to the Purchaser, the Property was already significantly repaired.  Thus, in considering whether the Borough engaged in disparate treatment in refusing the transfer the agreement, these entities are not

similarly situated so as to implicate equal protection.  Summary judgment will be granted on behalf of Defendants on the equal protection claims.

####   c. **Breach of Doctrine of Fundamental Fairness (Count Six against all Defendants)**

Under New Jersey law, the doctrine of fundamental fairness "serves to protect citizens generally against unjust and arbitrary governmental action, and specifically against governmental procedures that tend to operate arbitrarily." Constantine v. Twp. of Bass River, 967 A.2d 882, 891 (N.J. Super. Ct. App. Div. 2009).  This doctrine serves "as an augmentation of existing constitutional protections or as an independent source of protection against state action."  Id. Fundamental fairness has "been 'invoked when the actions of government, though not quite rising to the level of a constitutional violation, nonetheless included aspects of fairness which required this Court's intervention.'"  C.P.M. v. D'Ilio, 916 F. Supp. 415, 421 (D.N.J. 1996) (quoting Doe v. Poritz, 662 A.2d 367, 421 (1995)).

Defendants argue that "[i]n light of the express language of the Financial Agreement which permits the Financial Agreement to be voided upon the sale of the property, Plaintiff cannot establish that the Borough engaged in an egregious deprivation sufficient to warrant the application of this doctrine.  In

short, the Financial Agreement expressly permits precisely the
action the Borough ultimately took of denying the transfer
request."  (ECF 34-1 at 38).

Plaintiff responds that the doctrine of fundamental
fairness "is specifically intended to guard 'against
governmental *procedures* that tend to operate arbitrarily.'"
(ECF 35 at 42) (quoting <u>Dorchester Manor v. Borough of New
Milford</u>, 287 N.J. Super. 114, 116 (App. Div. 1996) (emphasis in
original)).  In addition, Plaintiff urges that the interest here
is sufficiently compelling to warrant application of this
doctrine, comparing the interest here to that in <u>Dorchester
Manor</u> where the doctrine was applied to issue a "judgment
reimbursing the owner of a multi-family dwelling for the cost of
garbage collection and disposal fees."  (ECF 35 at 42).

Here, the parties bargained for and entered into a contract
that vested the Borough with discretion in determining whether
to transfer the Financial Agreement to a purchaser of the
property.  The state court ordered that the Borough was required
to consider Plaintiff's request and make its determination by
resolution.  (SOMF at ¶ 32).  Defendants followed this
directive.  (Id. at ¶ 44).  The Borough convened an Ad Hoc
Committee to consider the request.  (Id. at ¶ 35).  Then the Ad
Hoc Committee considered the matter and issued a resolution
declining to transfer the Financial Agreement to the proposed

purchaser of the property and stated its reasons.   (Id. at ¶ 44).

Although Plaintiff disagrees with the Committee's decision and takes issue with the lack of established procedures for making this decision, the Financial Agreement did not set out procedures, rules, regulations, factors, or requirements for the Borough in making its determination.  Nor did the Plaintiff return to state court to contend that the procedures implemented as a result of the state judge's rulings were inadequate or failed to abide by the letter or spirit of her rulings, rulings upheld by an appellate court.  There is simply nothing "unfair" about either the substantive decision of the Borough or how that decision was reached.  Accordingly, Plaintiff has not established that Defendants violated the doctrine of fundamental fairness in declining to transfer the Financial Agreement. Thus, this Court will grant summary judgment on behalf of Defendants on this claim.

### a. **Breach of Contract (Count Seven against the Borough)**

Under New Jersey law, to establish a breach of contract claim a plaintiff must demonstrate: (1) the existence of a valid contract, (2) defective performance by the defendant that resulted in a breach, and (3) resulting damages.  MacWilliams v. BP Prods. N.A., 2010 WL 4860629 (D.N.J. Nov. 23, 2010) (Kugler, J.) (citing Coyle v. Englander's, 199 N.J. Super. 212, 488 A.2d

1083, 1088 (N.J. Super. 1985)).  "Under principles of contract law[,] the construction and legal effect of an unambiguous writing is for the court and not for a jury.  Summary judgment may be entered in a case where the court is asked to construe contractual clauses that are clear and unambiguous despite the parties' differing views as to what consequences flow from those provisions."  <u>United States v. Bills</u>, 639 F. Supp. 825, 829 (D.N.J. 1986) (citations omitted).

Defendants assert that there is no breach of contract, stating that "as both the New Jersey Superior Court and Appellate Division have ruled, the express language of the Financial Agreement unambiguously provides the Borough with the discretion as to whether or not to consent to an assignment of the Financial Agreement to another party."  (ECF 34-1 at 40). Defendants further explain that they engaged in "a review process in accordance with Judge Silverman Katz's April 22, 2021 order."  (Id.).

Plaintiff does not point to any evidence of a breach of the express contract terms, but instead argues only about the covenant of good faith.  Thus, this Court will proceed to discussion of that claim.  Summary judgment will be granted on behalf of Defendants on Plaintiff's breach of contract claim.

**b. <u>Breach of Implied Covenant of Good Faith and Fair Dealing (Count Eight against the Borough)</u>**

The covenant of good faith and fair dealing is present in every contract and prohibits a party from depriving the other from receiving "the fruits of the contract." Sons of Thunder, Inc. v. Borden, Inc., 690 A.2d 575, 587 (N.J. 1997) (quoting Palisades Props., Inc. v. Brunetti, 207 A.2d 522, 531 (N.J. 1965)). Pursuant to the covenant of good faith and fair dealing, a defendant may be liable for a breach where it has not violated the express terms of the contract. Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs., 864 A.2d 387, 396 (2005). Important to a finding of a breach of the implied covenant is "[p]roof of 'bad motive or intention'" and evidence that the offending party "has engaged in some conduct that denied the benefit of the bargain originally intended by the parties." Id. (quoting Wilson v. Amerada Hess Corp., 773 A.2d 1121, 1130 (N.J. 2001) and 23 Williston on Contracts § 63:22, at 513-14 (Lord ed. 2002)). "An allegation of bad faith or unfair dealing should not be permitted to be advanced in the abstract and absent improper motive." Wilson v. Amerada Hess Corp., 168 N.J. 236, 773 A.2d 1121, 1130 (N.J. 2001). "Without bad motive or intention, discretionary decisions that happen to result in economic disadvantage to the other party are of no legal significance." Id.

Defendants argue that "the contractual language itself, which establishes that the benefits of the Financial Agreement

will be void upon the sale of the property, defeats this claim."
(ECF 34-1 at 41).  Moreover, Defendants point out that "[w]hen
weighing whether or not to approve the transfer, the Borough's
overriding consideration, as expressed by Mayor Brennan and the
Committee members, was not the qualifications of the purchaser
or their return on investment, but rather whether the transfer
was in the best interests of the Borough's taxpayers."  (ECF 34-
1 at 42).

Plaintiff alleges that "Defendants' arguments ignore the
fact that their discretion is not unfettered — Defendants cannot
unreasonably withhold consent to transfer the Financial
Agreement."  (ECF 35 at 43).  It explains that Defendants'
determination was unreasonable as "(1) the Defendants conducted
no financial analysis in unreasonably withholding their consent,
(2) neither Defendants' tax assessor nor CFO were consulted
prior to withholding consent, and (3) perhaps most importantly,
a proper financial analysis . . . had it been done by Defendants
would have demonstrated that the Borough benefitted more from
the transfer of the Financial Agreement and the continuation of
the PILOT than the imposition of ad valorem taxes upon the
Purchaser (as Defendants incorrectly suggest)."  (ECF 35 at 44-
45).

Defendants reply that "they did not consent to the
Agreement's transfer based on their understanding that returning

34

the Property to the tax rolls, where it would be subject to reassessment, rather than transferring the tax exemption after the Property was redeveloped, was in their taxpayers' best interests."  (ECF 36 at 17-18).  Accordingly, "Defendants acted well within their contractual rights under the Agreement."  (Id. at 18).

Although the Borough had complete discretion to determine whether to consent to the transfer of the LTTE, they have a duty of good faith in exercising this discretion.  Wilson, 773 A.2d 1121 at 1128 ("a party must exercise discretion reasonably and with proper motive when that party is vested with the exercise of discretion under a contract.").  Defendants expressed that they decided against transfer as it would be in the best interest of the citizens to collect ad valorum taxes.  (ECF 34-1 at 10; ECF 34-6 at 326-29).  While Plaintiff points to facts in the record that suggest that rejecting the transfer would not be a better financial decision, there is no requirement that Defendants decide in a way that is most financially prudent when viewed through the rearview mirror.  See Wilson, 773 A.2d at 1130 ("Without bad motive or intention, discretionary decisions that happen to result in economic disadvantage to the other party are of no legal significance.").

Plaintiff has not pointed to any requirement that the Borough analyze certain factors in its determination or present

a particular explanation for its decision-making.  Thus,
although Plaintiff argues that the process was deficient, this
does not demonstrate a lack of good faith.  Id.; Whitman v.
Herbert, No. A-4234-09T2, 2012 WL 787380, at *8 (N.J. Super. Ct.
App. Div. Mar. 13, 2012) ("The essential element in a claim of a
breach of the good faith obligation is a finding of improper
motive.").  Plaintiff has cited to no authority, and this
Court's independent research has revealed none, that allows a
party to a contract with a municipality to sue for the breach of
the covenant of good faith and fair dealing simply because the
public entity otherwise acting within its lawful discretion made
a choice someone might view as ill-informed or imprudent or
unwise.  The remedy for such miscues, if any occurred, is at the
ballot box.

Plaintiff alleges that the Borough did not act in good
faith insofar as its decision not to approve the transfer of the
Financial Agreement was motivated by anti-Semitism.  (ECF 35 at
20-21).  In support of its criticism of the decision-making
process, Plaintiff states that the Ad Hoc Committee met with the
Purchaser's principal, Mr. Haikins, on two Zoom calls and during
depositions "not a single member of the Ad Hoc Committee would
admit under oath that Mr. Haikins was wearing his kippah during
both calls or that the Purchaser's offices were in Lakewood, New
Jersey or that the Purchaser's investors were of the Orthodox

Jewish faith."  (Id. at 20).  Plaintiff further states that
"Defendants admittedly conducted no financial analysis in
rejecting Citadel's Orthodox Jewish Purchaser."  (Id. at 21).
While evidence of anti-Semitism could provide a basis for a
finding of the breach of good faith and fair dealing, Plaintiff
has not pointed to evidence of anti-Semitism from the voting
councilmembers that passed the resolution.  The mere fact that
the Ad Hoc Committee may have been aware that Mr. Haikins was of
the Orthodox Jewish faith does not demonstrate animus.

The other allegations of anti-Semitism are too removed from
the Council's decision to support a finding of breach of good
faith.  These allegations include: (1) that in 2009 the Borough
required a performance bond as a contingency from a
redevelopment entity with a Jewish principal, Norse, before
entering into a redevelopment agreement, which ultimately caused
the agreement to fall through; (2) that an attorney for the
Borough referred to Norse as slumlords in 2011 and another
"unknown individual" also referred to Norse as slumlords in
2013; (3) that in 2018 Mayor Brennan asked if the Property was
being sold to a Zev Rothschild in a tone that Plaintiff
interpreted as emphasizing the Jewish name; (4) Mayor Brennan
being "disturbed" by at the prospect of the sale of the Property
to Rothschild; and (5) that in 2020 an "unidentified Borough
police officer" commented on the prospective sale of the

37

Property stating that "these Jews have enough money."  (SOMF at ¶ 56; CSOF at ¶ 11).

First, Plaintiff's characterization of the fact that the Borough sought assurances from Norse before entering into an agreement as anti-Semitic is not supported by any facts in the record.  Second, the term slumlord is not affiliated with a particular group of people and the mere fact that it was used to describe an entity with a Jewish principal one time in 2011 by the Mayor and again two years later by an undefined person is simply too attenuated for a rational factfinder to conclude the named Defendants harbored a malicious motive towards the Jewish community.  In addition, the allegations about the tone of voice used when referring to someone Plaintiff identifies as having a Jewish name is purely speculative.

Finally, the statement made by the Borough police officer does display animus towards Jewish people and is as offensive as it is disturbing.  However, there is simply no evidence that the sentiments of this single Borough police officer, as deeply troubling as they are, represent the motivations of the Borough or the Council and even if true simply fail to raise an issue of material fact regarding the defendant decision makers in this case.  Accepting these allegations as true for purposes of this analysis, the allegations are too far removed from the Council's

decision here to demonstrate a malicious motive and therefore a disputed issue of material fact.

In sum, Plaintiff has not pointed to any evidence to support that this prejudice was held by any other Borough employee or any Borough employee with decision-making power related to this case.  Moreover, Plaintiff has not pointed to a single anti-Semitic comment made by any councilmember.  As such, it has not pointed to facts from which a rational factfinder could conclude that anti-Semitism motivated the Borough's denial of the request to transfer the Financial Agreement.  The Court will grant summary judgment on Count Eight.

### c. **Violation of New Jersey Law (Count Nine against all Defendants)**

Defendants argue that "Defendants are entitled as a matter of law to summary judgment dismissing Plaintiff's claim in Count IX because, as set forth above, Plaintiff cannot establish that the Borough's contractually permissible denial of the transfer request was 'arbitrary, capricious, unreasonable and otherwise unlawful under New Jersey law.' As set forth above at length, the Borough acted in the best interests of its citizens and taxpayers and well within the confines of the Financial Agreement's explicit language."  (ECF 34-1 at 43).

Count IX of the Complaint alleges a "violation of New Jersey law" and seems to be a catchall allegation intended to

capture any "arbitrary, capricious, unreasonable and otherwise unlawful" conduct.  This is not a standalone claim.  Plaintiff has not made an argument with respect to this claim in its summary judgment briefing.  As such, summary judgment on this claim will be granted.

### d. Monell Claims against the Borough

Counts One through Five are raised against all defendants, including the Borough, and as such set forth claims under Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978) against the Borough.  Under Monell, "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.  Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978).  Liability may be imposed against a municipality only "when the policy or custom itself violates the Constitution or when the policy or custom, while not unconstitutional itself, is the 'moving force' behind the constitutional tort of one of its employees."  Thomas v. Cumberland County, 749 F.3d 217, 222 (3d Cir. 2014) (citations omitted).  "[M]unicipal liability under § 1983 attaches where – and only where – a deliberate choice to follow

a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986). A policymaker is a person who is "responsible for establishing final government policy respecting" the activity in question and "whether an official had final policymaking authority is a question of state law." Id.

For a policy or custom claim, in addition to pleading that a policy or custom inflicted the injury in question, a plaintiff must also allege that the policy or custom was the proximate cause of his injuries. Estate of Roman v. City of Newark, 914 F.3d 789, 798 (3d Cir. 2019). To do this, a plaintiff must demonstrate "an 'affirmative link' between the policy or custom and the particular constitutional violation he alleges," such as where the plaintiff shows that the municipality "had knowledge 'of similar unlawful conduct in the past, . . . failed to take precautions against future violations, and that [its] failure, at least in part, led to [his] injury.'" Id. (citation omitted). A plaintiff does not need to identify a responsible decisionmaker in his pleadings, and a plaintiff is not required to prove that the custom had the municipality's formal approval. Id. (citation omitted).

Defendants argue that "there is no evidence that any constitutional violation has occurred or, moreover, that any Borough policy, custom or procedure was the cause of Plaintiff's alleged civil rights violations resulting from the outrageous allegation that that Council's denial of the transfer request was motivated by anti-Semitism."  (ECF 34-1 at 37-38).

Plaintiff responds that "the Borough adopted and promulgated a resolution denying the transfer of the Financial Agreement.  This resolution constitutes 'formal approval through the [Borough's] official decisionmaking channels' and the Borough may therefore be held liable for the unconstitutional deprivation of rights visited upon Citadel as a result."  (ECF 35 at 25).

The Court will assume without holding that the adoption of the Borough resolution at issue would qualify as a policy, custom or procedure sufficient to establish <u>Monell</u> liability.[4]

---

[4]    This Court's decision to make this assumption should not be construed as so finding or holding that the Borough resolution qualifies as a policy under <u>Monell</u>.  Memorializing an action by way of an ordinance does not, in and of itself, mean that those actions were taken in accordance with an official policy.  <u>See City of Oklahoma City v. Tuttle</u>, 471 U.S. 808, 823-24 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under <u>Monell</u>, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker. Otherwise, the existence of the unconstitutional policy, and its origin, must be separately proved. But where the policy relied upon is not itself unconstitutional, considerably more proof than the single

However, a central requirement to bring a <u>Monell</u> claim is a constitutional violation.  Although Plaintiff has alleged a violation of its due process and equal protection rights, Plaintiff has failed to carry its burden of production sufficient to withstand summary judgment on any constitutional violation.  The state court explained that "Plaintiff does not possess an unequivocal right to transfer the LTTE in the Financial Agreement, but merely had an abstract expectation in selling the property with the Financial Agreement attached upon the Borough's consent."  (ECF 34-6 at 275).

As this Court discussed above, Plaintiff has not demonstrated a constitutional right or interest in the transfer

---

incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation.").

This Court notes that both Parties present arguments that seem to be in conflict.  In arguing against a <u>Monell</u> claim, Defendants assert that the Council did not act pursuant to a Borough policy or custom; however, in arguing for legislative immunity for the individual Councilmembers Defendants state that their actions were done in accordance with official policy.  On the other hand, Plaintiff urges the opposite, urging that the Council's actions were done pursuant to a Borough policy or practice in seeking to maintain their claims against the Borough, but argue that the Councilmember's actions were not based on a broad-based policy in seeking to avoid legislative immunity.  Of course, parties are permitted to make arguments in the alternative.  That said, this Court notes this apparent contradiction from both Parties. Here, the Court proceeds under the assumption that Plaintiff asserts a claim that the resolution was simply another example of a broader unofficial policy or custom of anti-Semitism, a contention unsupported by the material and uncontested facts.

of the Financial Agreement nor has Plaintiff demonstrated disparate treatment or discriminatory animus.  Plaintiff having failed to make out a claim of a constitutional violation cannot make out a <u>Monell</u> claim against the municipality and Counts One through Five will be dismissed as against the Borough.

**IV.   <u>CONCLUSION</u>**

For the reasons set forth above, Defendants' Motion for Summary Judgment will be granted in full.

An appropriate Order follows.


Date: November 22, 2023          s/ Noel L. Hillman
At Camden, New Jersey            NOEL L. HILLMAN, U.S.D.J.